IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

PANHANDLE EASTERN PIPE LINE COMPANY, LP, §
                                          §
    *Plaintiff*,                          §
                                          §
*v.*                                      §      Civil Action No._____
                                          §
PIPELINE AND HAZARDOUS MATERIALS          §
SAFETY ADMINISTRATION; HOWARD             §
MCMILLAN, in his official capacity as Executive §
Director of PHMSA; and LAWRENCE T. WHITE, §
in his official capacity as a Presiding Official, §
                                          §
    *Defendants*.                         §

## COMPLAINT

TO THE HONORABLE MATTHEW J. KACSMARYK, UNITED STATES DISTRICT JUDGE:

Plaintiff Panhandle Eastern Pipe Line Company, LP ("Panhandle") files this Complaint against the Pipeline and Hazardous Materials Safety Administration ("PHMSA"); Howard McMillan, in his official capacity as Executive Director of PHMSA (performing the duties of Administrator); and Lawrence T. White, in his official capacity as a Presiding Official for PHMSA and alleges:

## INTRODUCTION

1.      This suit seeks to prevent PHMSA from continuing an unconstitutional in-house enforcement action against Panhandle (the "Enforcement Proceeding") in Houston, Texas, instead of before an Article III Court and jury located in the Northern District, Amarillo Division, where the pipeline at issue originates and traverses five panhandle counties, or in the Dallas Division where Panhandle and its parent both have their principal places of business.

2.      Panhandle operates the Panhandle Eastern Pipe Line, a 6,200-mile interstate pipeline system that delivers natural gas from wells and a pipeline originating in and including Carson, Hansford, Hutchinson, Moore, and Sherman Counties in the Amarillo Division to markets in the Midwest.  In 2020, a tragic accident at Panhandle's Borchers Station near Meade, Kansas, resulted in the death of an employee.  Two fieldmen were launching and receiving cleaning "pigs"—pipeline cleaning devices—through a segment of the pipeline when one of the pigs became stuck inside the receiver barrel due to ice accumulation.  With the receiver door open, one of the fieldmen attempted to break the ice with a steel rod.  The pig became dislodged, traveled out of the receiver, and struck the fieldman.  Sadly, he passed away as a result of his injuries.

3.      On June 15, 2023, PHMSA's Houston, Texas-based Director of the Southwest Region, Bryan Lethcoe, issued a Notice of Probable Violation ("NOPV") to Panhandle, addressed to its parent company, Energy Transfer, LP, in Dallas, Texas.  PHMSA alleged that Panhandle violated certain pipeline safety regulations by failing to follow Panhandle's internal manual of written procedures for pipeline operations, and that those alleged failures were either a causal factor in the incident or  increased the severity of the incident.

4.      Although Panhandle strongly disagrees with the allegations PHMSA has levied against it, this suit is not about the merits of those allegations.  Instead, this suit challenges an unconstitutional Enforcement Proceeding which should be adjudicated in an Article III District Court in the Northern District—not an in-house PHMSA tribunal.

5.      The Enforcement Proceeding is unconstitutional for at least two reasons.

First, the Enforcement Proceeding violates the Seventh Amendment because PHMSA's attempt to adjudicate liability and impose significant civil penalties through an in-house tribunal deprives Panhandle of its constitutional right to a jury trial.  In *SEC v. Jarkesy* ("*Jarkesy II*"), the

Supreme Court held that the Seventh Amendment guarantees a jury trial in an administrative enforcement action if the claim being pursued by the agency "is 'legal in nature.'" 603 U.S. 109, 122 (2024) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). When the agency's enforcement action seeks civil penalties, as PHMSA does here, that remedy is "all but dispositive" in establishing that the claim is legal in nature. *Id.* at 123. PHMSA's Enforcement Proceeding is exactly such an action.

6.    <u>Second</u>, the in-house Enforcement Proceeding is unconstitutional because Congress delegated significant legislative power to the Department of Transportation[1] without providing an intelligible principle to guide its use of that power. The Fifth Circuit's decision in *Jarkesy v. SEC* ("*Jarkesy I*") held that a statutory scheme violates the Constitution when it authorizes an administrative agency to bring an enforcement action in either an in-house agency proceeding or an Article III court without providing an intelligible principle to guide the agency's discretion in selecting a forum. 34 F.4th 446, 462–63 (5th Cir. 2022).[2] PHMSA's enforcement scheme suffers from that same constitutional defect. Under the Pipeline Safety Act,[3] Congress authorized PHMSA to institute enforcement proceedings for civil monetary penalties either in house, 49 U.S.C. § 60122, or in federal district court, *id.* § 60120. Congress, however, "said nothing at all" indicating how PHMSA should decide which forum to utilize in any given case. That is "impermissible under the Constitution." *Jarkesy I*, 34 F.4th at 462.

7.    Additionally, PHMSA uses Presiding Officials (*i.e.*, hearing officers) to officiate and adjudicate in-house administrative proceedings. There are grave doubts, however, about

---

[1] The Department of Transportation then delegated that power to PHMSA. *See* 49 C.F.R. § 1.97(a).

[2] The Fifth Circuit's decision in *Jarkesy I* regarding the non-delegation clause was untouched by the Supreme Court's decision in *Jarkesy II* and thus remains binding law in the Fifth Circuit and this District.

[3] As amended in the Pipeline Safety Improvement Act of 2002, Pub. L. 107-355, § 8(b)(3), 116 Stat. 2985, 2993.

whether Presiding Officials' appointments and removability comport with Article II.  In *Lucia v. SEC*, the Supreme Court held that Administrative Law Judges ("ALJs") of the Securities and Exchange Commission ("SEC") were Officers of the United States, subject to the Appointments Clause of the Constitution.  585 U.S. 237, 241 (2018).  Accordingly, a hearing before an ALJ who was not appointed by the President, a "Court[] of Law," or "the Head[] of [a] Department" is constitutionally invalid.  U.S. Const. art. II, § 2, cl. 2; *Lucia*, 585 U.S. at 251–52.  PHMSA Presiding Officials, like the SEC's ALJs, have adjudicative authority and are vested with broad powers to carry out their responsibilities.  *See* 49 C.F.R. §§ 190.211(e), 190.212.  They "exercise the same 'significant discretion' when carrying out the same 'important functions'" *Lucia*, 585 U.S. at 248 (quoting *Freytag v. Commissioner*, 501 U.S. 868, 878 (1991)).  Accordingly, Presiding Officials are "Officers of the United States within the meaning of the Appointments Clause."  *Id.* at 244.  PHMSA makes very little information public regarding Presiding Officials' appointments. On information and belief, however, Presiding Officials are not appointed in accordance with the Appointments Clause; rather, on information and belief, they are hired into the excepted service, 5 U.S.C. § 2103, through the United States Office of Personnel Management's USAjobs website.[4]

8.    As to removability, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Supreme Court held that dual for-cause limitations on the removal of inferior officers violates "Article II's vesting of the executive power in the President."  561 U.S. 477, 484 (2010).  Presiding Officials are akin to ALJs and therefore qualify as inferior officers of the United States.  *See Lucia*, 585 U.S. at 241.  Additionally, on information and belief, PHMSA Presiding Officials enjoy tenure protections including limitations on removal—which must be done in

---

[4] Office of Personnel Management, *Senior Attorney Advisor (Presiding Official)*, USAJOBS (Aug. 8, 2024), https://perma.cc/76HN-XV4M.

accordance with certain procedures—and decisions on removal are subject to review by the Merit System Protection Board ("MSPB"). *See* 5 U.S.C. § 7513. In turn, members of the MSPB can only be removed by the President for cause. 5 U.S.C. § 1202(d). Accordingly, PHMSA Presiding Officials are unconstitutionally insulated from removal by the President by two layers of for-cause protection.

9.     Panhandle is entitled to a judgment declaring that PHMSA's in-house Enforcement Proceeding violates the Constitution and a permanent injunction which provides that PHMSA may not continue the unlawful Enforcement Proceeding in any way. Panhandle also respectfully submits that it is entitled to a preliminary injunction against PHMSA continuing to prosecute the Enforcement Proceeding, pending this Court's disposition of the claims presented in this Complaint.

## JURISDICTION AND VENUE

10.     This Court has competent subject-matter jurisdiction under 28 U.S.C. § 1331 because Panhandle's  claims arise under the United States Constitution. *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 180 (2023) (holding that federal district courts have jurisdiction to adjudicate structural constitutional claims against an agency, regardless of the pendency of related agency proceedings); *accord Cochran v. SEC*, 20 F.4th 194, 198–204 (5th Cir. 2021) (en banc).

11.     This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and under its inherent equitable powers.

12.     Venue is proper in this Court because "a substantial part of the events or omissions giving rise to the claim occurred" in this District. 28 U.S.C. § 1391(e)(1)(B). The Panhandle Eastern Pipe Line is an interstate natural gas transmission pipeline, portions of which are

physically sited in Carson, Hansford, Hutchinson, Moore, and Sherman Counties, all of which are within the Amarillo Division of this Court. The Panhandle Eastern Pipe Line's point of origin is located in the Amarillo Division. Panhandle maintains multiple compressor stations in the Amarillo Division and transports gas gathered from wells located in the Amarillo Division. Moreover, Panhandle conducts significant operations, and maintains its principal place of business, within this District. *Id.* § 1391(e)(1)(C).

## PARTIES

### A.    Panhandle

13.    Panhandle Eastern Pipe Line Company, LP is a limited partnership organized under Delaware law and headquartered in Dallas, Texas. Panhandle operates the Panhandle Eastern Pipe Line, a 6,200 mile interstate system that delivers natural gas from northern Texas to markets in the Midwest.  Panhandle is a subsidiary of Energy Transfer, LP ("Energy Transfer"), which is one of North America's largest and most diversified midstream energy companies.  Energy Transfer owns more than 130,000 miles of pipelines and associated energy infrastructure in forty-four states. Energy Transfer also is headquartered in Dallas, Texas.

### B.    Defendants

14.    The Pipeline and Hazardous Materials Safety Administration is an agency of the United States Department of Transportation.  PHMSA is responsible for regulating pipeline transportation and pipeline facilities, as well as the transportation of hazardous materials. *See* 49 U.S.C. §§ 108, 5103, 60102.  PHMSA has wide-ranging investigatory and enforcement power over pipeline operators, and it exercises that authority to ensure compliance with pipeline safety laws and regulations. *See, e.g.*, *id.* §§ 60118, 60120, 60122.

15.    Defendant Howard McMillan ("Executive Director McMillan") is a natural person who has served as the Executive Director of PHMSA since 2016.  On information and belief, Executive Director McMillian has been performing the duties of PHMSA Administrator.[5]

16.    Defendant Lawrence T. White ("Presiding Official White") is a natural person who serves as a Presiding Official for PHMSA.  Presiding Officials are attorneys on the staff of the Deputy Chief Counsel.  49 C.F.R. § 190.212(a).  On information and belief, Presiding Official White previously served as an Attorney Advisor in PHMSA's Office of Chief Counsel, where he represented PHMSA in enforcement proceedings and aided in the prosecution of violations of pipeline safety laws.

## FACTS

### A.    PHMSA's Enforcement Powers

17.    Congress authorized the Secretary of the Department of Transportation to enforce federal pipeline safety laws and regulations.  *See* 49 U.S.C. § 60102.  The Secretary of Transportation has in turn delegated that authority to PHMSA.  *See id.* § 108; 49 C.F.R. § 1.97(a).

18.    PHMSA has authority to conduct investigations, issue subpoenas, require the production of records, perform tests, and issue notices and warnings.  *See* 49 U.S.C. § 60117(a); 49 C.F.R. §§ 190.203, 190.205.

19.    PHMSA also may institute an enforcement action against a party that is alleged to have violated a federal pipeline safety law, regulation, or order.  Congress has authorized PHMSA to initiate such an action either through an in-house agency proceeding or in federal district court.

---

[5] The positions of Administrator and Deputy Administrator of PHMSA are currently vacant, and there is currently no Acting Administrator or Acting Deputy Administrator.

*See* 49 U.S.C. §§ 60120, 60122; *see also* 49 C.F.R. §§ 190.221, 190.235.  Congress, however, has

not provided any standard to guide the agency in deciding which forum to utilize.

20.    PHMSA is empowered by statute to seek civil monetary penalties against an

enforcement target.  *See* 49 U.S.C. §§ 60120, 60122; 49 C.F.R. § 190.221.  When determining the

amount of a civil penalty, PHMSA <u>must</u> consider:

> [1] the nature, circumstances, and gravity of the violation, including adverse impact
> on the environment; [2] the degree of culpability [of the violator], any history of
> prior violations, and any effect on ability to continue doing business; [3] good faith
> in attempting to comply; and [4] self-disclosure and correction of violations, or
> actions to correct a violation, prior to discovery by the Pipeline and Hazardous
> Materials Safety Administration.

49 U.S.C. § 60122.  In addition, PHMSA <u>may</u> consider "[5] the economic benefit gained from the

violation without any reduction because of subsequent damages; and [6] other matters that justice

requires."  *Id.*; *see also id.* § 60120 (requiring consideration of the same factors when seeking a

civil penalty in an enforcement proceeding initiated in federal court).

21.    When taking enforcement action through an in-house proceeding, PHMSA initiates

the proceeding by issuing a notice to the enforcement target.  *See* 49 C.F.R. § 190.206 (notice of

amendment to required plans or procedures); *id.* § 190.207 (NOPV); *id.* § 190.233 (notice of

intention to issue a corrective action order); *id.* § 190.239 (notice of proposed safety order).

22.    When, as here, PHMSA has issued an NOPV to the enforcement target, the notice

must include a "[s]tatement of the provision of the laws, regulations or orders" that the target is

alleged to have violated and "a statement of the evidence upon which the allegations are based."

*Id.* § 190.207(b)(1).  If a civil penalty is proposed, the notice must include the amount of the

proposed penalty and the maximum civil penalty allowed under law.  *Id.* § 190.207(b)(3).

23.    In an in-house proceeding, the maximum penalty is "$272,926 for each violation

for each day the violation continues, with a maximum administrative civil penalty not to exceed

$2,729,245 for any related series of violations." *Id.* § 190.223; *see Revisions to Civil Penalty Amounts, 2025*, 89 Fed. Reg. 106,282, 106,294 (Dec. 30, 2024); *see also* 49 U.S.C. § 60122(a)(1). Additional penalties may apply for specific types of violations. *See, e.g.*, 49 C.F.R. § 190.223(c) (providing for additional penalties for violating a standard for liquified natural gas pipeline facilities).

24.    PHMSA also may issue compliance orders that require an enforcement target to take corrective action that PHMSA deems necessary. *See* 49 U.S.C. § 60118(b). If a compliance order is proposed as a remedy, then the NOPV must include a statement of the remedial action sought. 49 C.F.R. § 190.207(b)(4).

25.    An enforcement target who chooses to contest an NOPV may submit a written response to the allegations or request a hearing. *Id.* § 190.208(a)(3), (a)(4), (b)(3), (b)(4); *id.* § 190.211. An enforcement target also is entitled to the case file for its enforcement proceeding. *Id.* § 190.209(a). The PIPES Act of 2020[6] requires that a case file contain "all agency records pertinent to the matters of fact and law asserted." 49 U.S.C. § 60117(b)(1)(C). Despite this Congressional directive, PHMSA has not updated the regulation regarding the *contents* of the case file since 2013, and PHMSA's regulation does not require the inclusion of such materials in the case file. *See* 49 C.F.R. § 190.209(b); *Pipeline Safety: Administrative Procedures; Updates and Technical Corrections*, 78 Fed. Reg. 58,901, 58,910 (Sept. 25, 2013). In Panhandle's case, PHMSA has refused to include relevant information and agency records in the case file, over Panhandle's objections, and has thus denied Panhandle access to relevant information in violation of the PIPES Act.

---

[6] Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Pub.L. 116-260, 134 Stat. 1182 (Dec. 27, 2020) (codified at 49 U.S.C. § 60117(b)(1)(C)).

26.     The hearings are held before a Presiding Official, who is a PHMSA employee.  *See* 49 C.F.R. § 190.212(a).  Specifically, Presiding Officials are attorneys who are on the staff of PHMSA's Deputy Chief Counsel.  *Id.*  On information and belief, Presiding Officials are the functional equivalent of Administrative Law Judges used in other agencies and operate as inferior officers under Article II of the United States Constitution.  *See Lucia*, 585 U.S. at 241.

27.     Few regulations speak to the PHMSA hearing process, and they provide very little guidance with regard to hearing administration and procedure or the due process rights of enforcement targets.  *See, e.g.*, 49 C.F.R. §§ 190.211, 190.212.  Similarly, PHMSA's published Administrative Enforcement Processes' section regarding the procedure for conducting a hearing spans a scant one page.  *See* PHMSA, *Administrative Enforcement Processes* 46 (Oct. 18, 2022).

28.     Pursuant to the regulations, "[t]he hearing is conducted informally without strict adherence to rules of evidence."  49 C.F.R. § 190.211(e); *see also* PHMSA, *Administrative Enforcement Processes* 46 (Oct. 18, 2022)[7] ("All PHMSA hearings are considered 'informal adjudications,' meaning that they do not adhere to the formal procedures used by courts or strict rules of evidence.").  Accordingly, very few constraints are placed on the agency's actions and very few (if any) due process protections for the enforcement target.  These informal proceedings raise a host of concerns involving due process and fair notice.  For example, in Panhandle's experience, PHMSA has refused to put relevant evidence into the case file, withheld relevant evidence from Panhandle, failed to disclose the agency's witnesses before the hearing, and failed to provide Panhandle adequate opportunity to call and cross-examine adverse witnesses.  Additionally, on information and belief, members of PHMSA's enforcement staff engage in *ex*

---

[7] Available at https://perma.cc/4W6Q-2FF2.

*parte* communications with the Presiding Official, despite a regulation prohibiting such communications.  *Id.* at § 190.210(b).

29.    After the hearing, the Presiding Official will prepare a recommended decision.  49 C.F.R. § 190.211(h).  The recommended decision is forwarded to PHMSA's Associate Administrator, who "considers the case file and issues a final order."  *Id.* § 190.213; *see id.* § 190.211(h).  Critically, the enforcement target is not provided a copy of the recommended decision, and there is no record provided through which the enforcement target can determine whether the final order is substantively different from the Presiding Official's recommended decision.  PHMSA's operating procedures are contrary to the Administrative Procedure Act and do not afford an enforcement target due process.

30.    Once a final order is issued, an enforcement target may petition an appropriate United States court of appeals for judicial review.  49 U.S.C. § 60119(a).

31.    Alternatively to the administrative enforcement process, PHMSA may institute an enforcement action in federal district court.  *See* 49 U.S.C. § 60120(a)(1) ("At the request of the Secretary of Transportation, the Attorney General may bring a civil action in an appropriate district court of the United States to enforce" pipeline safety laws and regulations.); *see also* 49 C.F.R. § 190.235.  The case is instituted by the Attorney General of the United States on behalf of PHMSA, and the district court is empowered to award appropriate relief including civil penalties, injunctive relief, and punitive damages.  49 U.S.C. § 60120(a)(1).

32.    In actions instituted in district court, the typical processes and protections attendant to the federal court forum apply, such as an impartial, lifetime-appointed Article III judge to adjudicate the dispute; applicability of the Federal Rules of Civil Procedure and the Federal Rules of Evidence; due process; and the right to a jury trial.

**B.    An Unfortunate Accident at Panhandle's Borchers Station**

33.    On March 26, 2020, two Panhandle fieldmen were engaged in launching and retrieving cleaning pigs at Panhandle's Borchers Station.  Cleaning pigs are devices used to sweep debris and other materials from the interior of a pipeline.

34.    Around 2:00 p.m., the fieldmen were attempting to retrieve one of the cleaning pigs from the pig receiver, but the cleaning pig was stuck inside the barrel due to ice accumulation. The receiver door was open, and one of the fieldmen attempted to dislodge the cleaning pig by chipping the ice using a steel rod.  The cleaning pig became dislodged, traveled out of the receiver barrel, and struck one of the fieldmen.  Tragically, the fieldman passed away at the local hospital because of his injuries.

**C.    PHMSA's Enforcement Proceeding Against Panhandle**

35.    In the two days following the accident, PHMSA conducted an on-site investigation at Borchers Station.  PHMSA then waited approximately <u>three years</u>, until June 15, 2023, to issue an NOPV to Panhandle, initiating the Enforcement Proceeding.[8]  The NOPV alleged that Panhandle committed three violations of the pipeline safety regulations in connection with the accident.  *See* 49 C.F.R. §§ 192.605(a), (b)(8); 192.805(a).  Specifically, PHMSA alleged that Panhandle failed to: (1) follow its internal manual of written safety procedures; (2) periodically review those procedures for efficacy and adequacy; and (3) include the operation and maintenance task of launching and receiving pigs in its written Operator Qualification Plan.

36.    PHMSA proposed the assessment of a $2,473,912 civil penalty for the alleged violations and the issuance of a Compliance Order, which orders remedial measures for two of the

---

[8] The Enforcement Proceeding is case number CPF 4-2023-011-NOPV.

alleged violations.  Despite its decision to propose monetary civil penalties, PHMSA chose not to proceed in federal district court where Panhandle would have been entitled to a jury trial.

37.    Panhandle responded to and contested the NOPV by requesting a hearing.  *See* 49 C.F.R. § 190.208(a)(4), (b)(4).

38.    In preparation for the hearing, Panhandle submitted a Statement of Issues and requested the case file.  *See* 49 C.F.R. §§ 190.209(a) (entitling enforcement target to case file); 190.211(b) (requiring a statement of issues that respondent intends to raise at the hearing). Panhandle also submitted requests for production, including a specific request for the proposed civil penalty calculation worksheet (the "Civil Penalty Worksheet") in its native Microsoft Excel format.  PHMSA publishes a "Civil Penalty Summary" on its website, but it merely provides examples of violating conduct and approximate penalty ranges.[9]  It does not provide an explanation regarding how a specific penalty determination is made.  Consequently, Panhandle needs the Civil Penalty Worksheet to understand the civil penalty being proposed against it for this particular case. *Cf.* PHMSA, *Civil Penalty Summary* (Jan. 19, 2024) ("Application of the assessment considerations in an individual case will depend on the facts specific to that case.").

39.    Although one of the issues to be addressed at the hearing was the "methods or procedures by which PHMSA determines the amount of proposed civil penalties," PHMSA refused to produce the Civil Penalty Worksheet.  PHMSA would only provide a portable document format ("PDF") version, which prevented Panhandle from seeing the calculations on which the penalty was based.  Worse yet, Presiding Official White declined to order its production.  *See* 49 C.F.R. § 190.212 (providing that a Presiding Official has the power to "[r]equire the submission of documents").  When Panhandle requested that the Presiding Official issue a subpoena to require

---

[9] PHMSA, *Civil Penalty Summary* (Jan. 19, 2024), https://perma.cc/2YNV-8M2P.

its production, Presiding Official White responded that "the agency's subpoena authority has never been used by an agency hearing official for the purpose of subpoenaing records in connection with an informal hearing" and "it is not clear that a PHMSA hearing official has the authority to issue a subpoena to [the agency] during the adjudicatory stage of a compliance proceeding." Accordingly, Panhandle was left with no ability to procure relevant information, no recourse through the Presiding Official, and could not fully understand or challenge the manner in which PHMSA calculated the significant civil penalties proposed.

40.    Moreover, what little information PHMSA did provide about the penalty calculation demonstrated fundamental unfairness. PHMSA calculates the proposed penalty for an NOPV by establishing a number of "points" and then multiplying that number of points by a set "per-point" value. Per-point values are increased annually. Even though the accident happened in 2020, when PHMSA calculated the proposed civil penalty for the Enforcement Proceeding, PHMSA used the significantly higher per-point value applicable in 2023—the year it decided to issue the NOPV. PHMSA acknowledged that its "practice" is to use the per-point value applicable when it calculates the proposed civil penalty—even if it is several years after the violation—rather than the per-point value applicable when the violation occurred.

41.    On April 24, 2024, the hearing was held before Presiding Official White. On information and belief, Presiding Official White previously served as an Attorney Advisor where he represented PHMSA in enforcement proceedings and aided in the prosecution of violations of pipeline safety laws and regulations.

42.    Although the regulations require the Presiding Official to "conduct a fair and impartial hearing," 49 C.F.R. § 190.212(c), Panhandle's experience was anything but. At the hearing, it became apparent that not "all agency records pertinent to the matters of fact and law

asserted" had been provided to Panhandle.  49 U.S.C. § 60117(b)(1)(C).  For example, Greg Ochs, a supervisor in PHMSA's Office of Pipeline Safety, relied on certain work history reviews in his questioning of a witness.  Those reviews were not in the case file and, although Mr. Ochs stated during the hearing that he would provide them to Panhandle, he never did.

43.     Panhandle also renewed its request for the Civil Penalty Worksheet in its native format at the hearing.  Presiding Official White again declined to order its production.  Presiding Official White claimed that he "cannot accommodate that request" and instead suggested that Panhandle "request it in writing from the chief counsel or the acting chief counsel."

44.     PHMSA's Director of Enforcement, Rod Dyck, testified at the hearing.  Because Panhandle was not provided with the underlying calculations in the Civil Penalty Worksheet, it could not meaningfully examine Mr. Dyck regarding the proposed civil penalty.  Moreover, Mr. Dyck was unforthcoming and refused to respond to questions about the content of and calculations within the Civil Penalty Worksheet.  For example, Mr. Dyck could not explain how PHMSA decided to impose a multiplier of 12 to the civil penalty because he "do[es]n't recall."  He also testified that PHMSA does not have a record of how it came to the 12x multiplier, and therefore Mr. Dyck "do[es]n't have the capability to look it up."  When Panhandle asked why PHMSA does not maintain a record of the decision-making process, Presiding Official White cut off the line of questioning.

45.     Two months after the hearing, on June 27, 2024, the U.S. Supreme Court decided *Jarkesy II* which brought the unconstitutional nature of the Enforcement Proceeding sharply into focus.  Panhandle is entitled to a jury trial because PHMSA is seeking civil monetary penalties against it.  Panhandle, however, is being forced to endure an unconstitutional agency proceeding

where it is being denied due process, including the ability to meaningfully challenge the very penalties that entitle Panhandle to a jury trial.

46.     On July 1, 2024, PHMSA's Office of Pipeline Safety submitted a Region Recommendation that recommended the assessment of a $2,455,312 civil penalty and issuance of the Compliance Order proposed in the NOPV.  Panhandle submitted a response pursuant to 49 C.F.R. § 190.209(b)(7).

47.     Six months after the hearing and five months after the administrative record was closed, on October 28, 2024, Presiding Official White provided an Excel version of the Civil Penalty Worksheet to Panhandle by email.  In a seeming admission of *ex parte* communication with the agency members prosecuting the enforcement proceeding, *see* 49 C.F.R. § 190.210(b) (prohibiting *ex parte* communication), the transmitting email stated that Presiding Official White had "recently been informed that the agency has decided to begin providing the proposed civil penalty worksheet in Excel Spreadsheet format if requested by a pipeline operator in response to an enforcement proceeding.  Accordingly, by attachment to this e-mail I am providing it to you for this case." Panhandle was not copied on any communication where the Presiding Official was so "informed," nor has Panhandle been provided such communications.  Presiding Official White thereafter granted Panhandle 30 days to supplement its Post-Hearing Brief.

48.     The Civil Penalty Worksheet provided on October 28, 2024, however, was password protected and contained hidden rows.  Accordingly, none of the variables could be changed and sensitivity analyses could not be performed.  When Panhandle requested the password or a version that was not password-protected, Presiding Official White responded, "At the present time, I have no information that would give me reason to expect any further proposed civil penalty worksheet submissions from the agency in this case."  The following week, PHMSA Region

counsel provided a second Excel version of the Civil Penalty Worksheet. Counsel indicated that certain rows in the spreadsheet had been "unhidden." The Worksheet, however, was still password-protected.

49.     Ultimately, Panhandle was forced to object to the admission of the password-protected Civil Penalty Worksheet into the administrative record. On November 24, 2024, Presiding Official White granted Panhandle's request to exclude the Worksheet. Presiding Official White also withdrew Panhandle's opportunity to supplement its Post-Hearing Brief, hampering Panhandle's ability to create a record regarding the potential *ex parte* communications, the denial of opportunity to properly examine witnesses regarding the Civil Penalty Worksheet, and PHMSA's production of a password-protected Civil Penalty Worksheet that contained hidden rows.

50.     Presiding Official White will issue a Recommended Decision informed by the Region Recommendation soon, if he has not done so already. Thereafter, the Associate Administrator will issue a Final Order likely imposing significant civil penalties on Panhandle.

51.     This suit is timely. Panhandle has been enduring the unfairness of the Enforcement Proceeding from the start. Panhandle has been requesting all relevant documents, including the Civil Penalty Worksheet, since the Enforcement Proceeding began  in June 2023. To this day, however, Panhandle is being denied access to the information it needs to fairly present its defense. Panhandle was forced to participate in an agency hearing that lacked procedural safeguards before a Presiding Official, who is a PHMSA employee. After the hearing, *Jarkesy II* was decided, which affirmed the Fifth Circuit's judgment, and the unconstitutional nature of Enforcement Proceeding became all the more clear— Panhandle was entitled to a jury trial and the statutory scheme presents a non-delegation issue. Meanwhile, in addition to the structural constitutional problems, the

Enforcement Proceeding has continued to trample Panhandle's due process rights. In late October 2024, it came to light that Presiding Official White was having *ex parte* communications with agency enforcement officials. Through end of 2024 to today, Panhandle continues to litigate its entitlement to the Civil Penalty Worksheet's underlying calculations before the agency; but because Presiding Official White has recently indicated that such information will not be forthcoming, Panhandle can no longer endure the Enforcement Proceeding. Panhandle is forced to bring this suit to halt the unconstitutional agency proceedings and seek to have the Enforcement Proceeding brought in the proper forum: federal district court.

52.     Were the parties in federal court, where they should be, Panhandle would have the full protections of due process, including the procedural safeguards provided by the Federal Rules of Evidence and the Federal Rules of Civil Procedure. Panhandle would be entitled to discovery, and it would be able to move to compel the production of documents to counter PHMSA's refusal to provide relevant evidence. Most importantly, Panhandle would be able to present its case to a jury, instead of to a PHMSA Presiding Official.

## STANDING

53.     Panhandle has Article III standing to pursue the claims in this Complaint.

54.     "To establish Article III standing, a plaintiff must show" that it [1] "has suffered an 'injury in fact' that is [2] 'fairly traceable' to the defendant's conduct and [3] would likely be 'redressed by a favorable decision.'" *Collins v. Yellen*, 594 U.S. 220, 242 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. at 560–61 (1992)).

55.     With respect to the injury-in-fact requirement, Panhandle has suffered, is suffering, and will continue to suffer an injury in fact as a result of PHMSA's conduct. Panhandle is the

target of an ongoing unconstitutional agency proceeding, in which PHMSA is seeking to impose significant civil penalties.

56.    Panhandle has been denied its Seventh Amendment right to a jury trial, which is a structural error that constitutes an injury in fact and entitles Panhandle to injunctive relief.  *See Cochran*, 20 F.4th at 233 (Oldham, J., concurring)  ("A person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding."); *id.* (noting that a lawsuit of the type bought here "may be the only way to provide a 'meaningful avenue of relief'" when a plaintiff challenges an agency's "unimpeded control over the way it investigates and proceeds against its targets").

57.    Additionally, the administrative Enforcement Proceeding is being conducted pursuant to a statute that constitutes an unconstitutional delegation of legislative power.  Thus, Panhandle is being made to suffer through an unlawful Enforcement Proceeding, which also constitutes an injury in fact.

58.    Panhandle already has incurred significant legal fees defending against PHMSA's Enforcement Proceeding.  This type of "pocketbook injury is a prototypical form of injury in fact." *Collins*, 594 U.S. at 243; *see Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a quintessential injury upon which to base standing.").  Notably, if this Court were to agree that Panhandle is entitled to a trial by jury, such a judgment would protect Panhandle from having to incur expenses in connection with the ongoing agency proceeding, in the time period between now and when PHMSA issues a final decision.

59.    Through the Proposed Compliance Order, PHMSA seeks to require Panhandle to take certain remedial measures.  For example, the Proposed Compliance Order, if adopted, would impose, among other things, a requirement that Panhandle conduct an effectiveness review of

certain procedures at all of its facilities within 60 days, create new procedures and guidelines at certain facilities within 240 days, and train employees on the new procedures within 365 days. These measures also constitute an injury in fact, as they will be extremely costly and burdensome to implement.

60.    The Enforcement Proceeding also has inflicted, and is continuing to inflict, significant reputational injuries on Panhandle.  These reputational injuries are injuries-in-fact for purposes of Article III standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("reputational harms" are sufficient to constitute an injury for purposes of Article III standing); *Meese v. Keene*, 481 U.S. 465, 473–75 (1987) (plaintiff had standing to challenge government action that "would adversely affect his reputation in the community"); *Robertson v. Colvin*, 564 F. App'x 931, 934 (10th Cir. 2014) ("[I]njury to one's reputation can be a cognizable injury-in-fact to confer standing to bring suit."); *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 220 (3d Cir. 2013) ("[R]eputational harm is a cognizable injury in fact."), *abrogated on other grounds sub. nom Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).

61.    Absent this Court's intervention, PHMSA will imminently take action against Panhandle.  Presiding Official White is expected to issue a Recommended Decision soon to the Associate Administrator, if he has not already done so.

62.    There is a clear and direct causal connection between Panhandle's injuries and PHMSA's unconstitutional in-house proceeding.  All of Panhandle's injuries are attributable to and were or will be inflicted by PHMSA through that same unconstitutional in-house proceeding. Absent PHMSA pursuing its unconstitutional, ongoing in-house Enforcement Proceeding, Panhandle would not be enduring the injury (constitutional, reputational and monetary) of being subjected to an unconstitutional agency proceeding.  *See Collins*, 594 U.S. at 242.

63.    Panhandle's injuries are redressable through this suit because this Court can and should declare that: (1) Panhandle is entitled to a jury trial and (2) Congress impermissibly delegated legislative power to the Department of Transportation and PHMSA.  Moreover, this Court can and should enjoin the continuation of the in-house Enforcement Proceeding.  That relief would terminate Panhandle's ongoing injury of being exposed to an unlawful agency proceeding, and would also terminate the related injuries from the expense of participating in and defending against that proceeding.

## CLAIMS FOR RELIEF

### Count 1 (Declaratory and Injunctive Relief): PHMSA Unconstitutionally Deprived Panhandle of Its Right to a Jury Trial

64.    Panhandle incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

65.    The Founders described the right to a trial by jury as "the heart and lungs" of liberty[10] and as "the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution."[11]  The Supreme Court has aptly described jury trials as "fundamental" to the American legal system and as "one of our most vital barriers to governmental arbitrariness."  *Reid v. Covert*, 354 U.S. 1, 9–10 (1957).

66.    "Civil juries in particular have long served as a critical check on government power. So precious were civil juries at the time of the Founding that the Constitution likely would not have been ratified absent assurance that the institution would be protected expressly by amendment."  *Jarkesy I*, 34 F.4th at 451–52.  In adopting the Seventh Amendment, the Framers

---

[10] *The Revolutionary Writings of John Adams* 55 (C. Bradley Thompson ed., 2000).

[11] Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in The Papers of Thomas Jefferson* 267 (Julian P. Boyd ed., 1958).

"embedded" in the Constitution the right to a jury trial in civil cases, "securing it 'against the passing demands of expediency or convenience.'" *Jarkesy II*, 603 U.S. at 122 (quoting *Reid*, 354 U.S. at 10). The Supreme Court repeatedly has confirmed that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence" that "any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

67.      The Seventh Amendment to the United States Constitution provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

68.      In *Tull v. United States*, the Supreme Court construed the Seventh Amendment "to require a jury trial on the merits in those actions that are analogous to 'Suits at common law'" because, "[p]rior to the Amendment's adoption, a jury trial was customary in suits brought in the English law courts." 481 U.S. 412, 417–18 (1987) (emphasis altered). *Tull* confirmed that the fact that the cause of action giving rise to the dispute was "created by congressional enactment" does not mean that no jury trial is required; instead, the operative question is whether the "statutory action is . . . similar to cases that were tried in courts of law." *Id.* (emphasis added).

69.      In its recent decision in *Jarkesy II*, the Supreme Court reaffirmed that "[t]he Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'" 603 U.S. at 122 (quoting *Granfinanciera*, 492 U.S. at 53). The fact that the claim arises from a statute "is immaterial to th[e] analysis." *Id.* "To determine whether a suit is legal in nature," courts must "consider the cause of action and the remedy it provides," with the remedy being "the 'more important' consideration." *Id.* at 122–23 (quoting *Tull*, 481 U.S. at 421). *Jarkesy II* further

explained that "the remedy is all but dispositive" when an agency is seeking a civil penalty because it is "a type of remedy at common law that could only be enforced in courts of law." *Id.* at 123 (quoting *Tull*, 481 U.S. at 422).

70. This case is on all fours with *Jarkesy*. Panhandle is entitled to a jury trial on PHMSA's allegations against it, and therefore the Enforcement Proceeding is unconstitutional.

71. Following the Supreme Court's analysis, when determining the applicability of the Seventh Amendment, the Court looks at whether the claim is "legal in nature." *Id.* at 122. The claims against Panhandle, while part of a regulatory scheme, arise at common law. That is so because PHMSA is seeking a civil monetary penalty against Panhandle, which is "all but dispositive" to the inquiry regarding the nature of the claim. *Id.* at 123.

72. Moreover, the Supreme Court has recognized that lawsuits seeking civil penalties were "a particular species of an action in debt" that would have been adjudicated in an eighteenth-century English court of law, further confirming the legal nature of PHMSA's claims. *Tull*, 481 U.S. at 418 (collecting English law court cases characterizing a civil penalty as an action in debt).

73. The fact that PHMSA also seeks a Compliance Order that directs Panhandle to take certain actions does not undermine the Seventh Amendment's applicability. "[T]he Seventh Amendment applies to proceedings that involve a mix of legal and equitable claims—the facts relevant to the legal claims should be adjudicated by a jury, even if those facts relate to equitable claims too." *Jarkesy I*, 34 F.4th at 454 (citing *Ross .v Bernhard*, 396 U.S. 531, 537–38 (1970)).

74. Panhandle was entitled to a jury trial. The deprivation of the jury-trial right in cases covered by the Seventh Amendment is a fundamental structural error that requires vacatur of the entire proceeding. *See Jarkesy II*, 603 U.S. at 141; *Jarkesy I*, 34 F.4th at 459. Panhandle is entitled

to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that PHMSA's Enforcement Proceeding against Panhandle is unconstitutional. Panhandle is also entitled to a permanent injunction barring PHMSA from continuing the unconstitutional Enforcement Proceeding.

### Count 2 (Declaratory and Injunctive Relief): The Pipeline Safety Act Unconstitutionally Delegates Legislative Power to PHMSA

75.     Panhandle incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

76.     Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.

77.     The Constitution confers "all legislative Powers" to Congress, U.S. Const. art. I, § 1 (emphasis added), and "[a]ccompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion). "Congress cannot 'delegate to the Courts, or to any other tribunals, powers that are strictly and exclusively legislative.'" *Jarkesy I*, 34 F.4th at 460 (quoting *Wayman v. Southard*, 23 U.S. 1 (1825)).  This "nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).  That said,  "Congress may grant regulatory power to another entity . . . if it provides an 'intelligible principle' by which the recipient of the power can exercise it." *Jarkesy I*, 34 F.4th at 461 (quoting *Mistretta*, 488 U.S. at 372).

78.     In *Jarkesy I*, the relevant statutes gave the SEC, at its discretion, the ability to bring securities fraud actions for monetary penalties in federal court or within the agency.  The Fifth Circuit held that Congress unconstitutionally delegated power to the SEC by giving it "unfettered

authority to choose whether to bring enforcement actions in Article III courts or within the agency" without "an intelligible principle to guide its use" of that power. *Id.* at 459.

79.    The Fifth Circuit articulated a two-part inquiry for determining whether there has been an unconstitutional delegation of legislative power in contravention of Article I. Under that framework, the Court considers: "(1) whether Congress has delegated power to the agency that would be legislative power but-for an intelligible principle to guide its use and, if it has, (2) whether it has provided an intelligible principle such that the agency exercises only executive power." *Id.* at 461.

80.    The Supreme Court did not reach the non-delegation issue when it affirmed the Fifth Circuit's ruling in *Jarkesy I*. *See Jarkesy II*, 603 U.S. at 121. Accordingly, the Fifth Circuit's holding on the non-delegation issue remains the controlling law in this Circuit.

81.    Again, the instant case mirrors *Jarkesy I*. Congress has granted PHMSA the power to assign the adjudication of an enforcement action to an agency proceeding or to an Article III court. *See* 49 U.S.C. §§ 60120, 60122. And like the statutes at issue in *Jarkesy I*, the Pipeline Safety Act provides no guidance whatsoever as to how PHMSA should make the decision to proceed in one forum or the other in any given case; the choice is left to PHMSA's absolute and "unfettered discretion." *Jarkesy I*, 34 F.4th at 461. That is a delegation of legislative power without an intelligible principle to guide its use.

82.    Panhandle is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that the Pipeline Safety Act's administrative enforcement provisions are unconstitutional. Panhandle is also entitled to a permanent injunction barring PHMSA from continuing its unconstitutional proceeding against Panhandle.

**JURY DEMAND**

Panhandle demands a trial by jury on all issues triable as such.

**PRAYER FOR RELIEF**

**WHEREFORE**, Panhandle Eastern Pipe Line Company, LP respectfully requests that the

Court enter each of the following forms of relief:

        a.        Granting the forms of declaratory relief set forth above;

        b.        A stay or injunction barring continuation of the Enforcement Proceeding;

        c.        An award of the attorneys' fees, costs, and expenses that Panhandle has

incurred in connection with this action; and

        d.        Such other relief as is just and proper.

Respectfully submitted,

*/s/ George M. Kryder*

Vince Murchison
  Texas Bar No. 14682500
  Vince.Murchison@pipelinelegal.com
Haley O'Neill
  Texas Bar No. 24095105
  haley.oneill@pipelinelegal.com
MURCHISON O'NEILL, PLLC
325 North Saint Paul Street, Suite 2700
Dallas, Texas 75201
Telephone: (214) 716-1923
Facsimile: (844) 930-0089

George M. Kryder
  Texas Bar No. 11742900
  gkryder@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 220-7719
Facsimile: (214) 999-7719

William S. Scherman*
  D.C. Bar No. 384860
  wscherman@velaw.com
Jeremy Marwell*
  D.C. Bar No. 1000299
  jmarwell@velaw.com
Jason J. Fleischer*
  D.C. Bar No. 978810
  jfleischer@velaw.com
James T. Dawson*
  D.C. Bar No. 1602502
  Texas Bar No. 24094618
  jamesdawson@velaw.com
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6550
Facsimile: (202) 639-6604

*Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff Panhandle Eastern Pipe Line Company, LP*